UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBRA MEAD,

                Plaintiff,                            Case No. 1:06-CV-555

v.

                                            HON. ROBERT J. JONKER

COUNTY OF ST. JOSEPH, et al.,

                Defendant.

_____/

**OPINION**

**INTRODUCTION**

On August 3, 2006, Plaintiff Debra Mead ("Mead" or "Plaintiff") filed her five-Count complaint against Sergeant Tim Schuler, Deputy Matthew Stark, Deputy Harrington, Officer James Hasbrouck (collectively referred to as "Defendants"), and St. Joseph County ("Defendant County") alleging (1) a 42 U.S.C. § 1983 claim based on Defendants' violation of Plaintiff's Fourth and Fourteenth Amendment rights; (2) a 42 U.S.C. § 1983 claim based on Defendant County's violation of Plaintiff's Fourth and Fourteenth Amendment rights; (3) assault and battery; (4) civil conspiracy; and (5) gross negligence. (docket # 1). The discovery deadline was May 31, 2007. (docket # 7). Dispositive motions were due by June 30, 2007. (docket # 7). On June 29, 2007, Defendants and Defendant County filed a motion for summary judgment under FED. R. CIV. P. 56(c) ("Defendants' Motion"). (docket # 18). Defendants' Motion seeks summary judgment on each of Plaintiff's claims, and also asserts qualified immunity and governmental immunity.

# FACTS

It is undisputed that sometime after 2:00 a.m. on the morning of August 5, 2004, Plaintiff was arrested for driving while under the influence of alcohol.  (Pl.'s Dep. 41–42.)  The parties present differing accounts of the events following Plaintiff's arrest.   When considering a motion for summary judgment, the Court is required to view the facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Accordingly, this part of the Opinion presents the facts in the light most favorable to Plaintiff and resolves all factual disputes in her favor.[1]

During the booking process, Defendants—all of whom are men—asked Mead to remove her shoes and jewelry.  (Pl.'s Dep. 49–50.)  Mead initially refused to remove her necklace but eventually did so.  (*Id.* at 50.)  Defendants later told Mead to take off her clothes and put on a suicide gown. (*Id.* at 53.)  She told them that she was not suicidal and that she did not want to undress in front of them.[2]  (*Id.* at 53–54.)  She also told them that she did not want to take off her clothes in front of them because she had been sexually abused in the past.  (*Id.* at 54.)  She eventually sat down in the fetal position and begged them not to make her remove her clothes in front of them.  (*Id.* at 75.)

---

[1] The Court is mindful that, when deciding Defendants' Motion, Plaintiff's version of the facts need not be accepted if it is blatantly contradicted by the record, but because the record in this case does not blatantly contradict Plaintiff's version of the facts, the Court accepts Plaintiff's version of the facts.

[2] Mead told Defendants that she was not suicidal, but a reasonable juror could ultimately conclude that Defendants had legitimate questions about her state of mind.  Defendants were aware of Plaintiff's previous suicide attempt.   Plaintiff was intoxicated and might have appeared depressed.  Also, while on the way to the jail, Plaintiff explained that she would rather die than go back to jail, a statement Plaintiff explains under oath on the summary judgment record as simple hyperbole.  For purposes of summary judgment, even if the officers had reasonable questions about her state of mind, they may still have violated Plaintiff's civil rights on Plaintiff's version of the facts.

Defendants did not afford her an opportunity to change in private.[3]  (*Id.* at 54, 63.)  Instead, they told her that if she did not take off her clothes they would hold her down and forcibly strip her.  (*Id.*)

Mead refused to undress in front of Defendants, so Defendants followed through with their threat and forcibly undressed her.  (*Id.* at 55.)  Two of the Defendants held Mead's arms behind her back while another other took off her pants, socks, and blouse.  (*Id.*)  The fourth Defendant guarded the door and then moved behind Mead to unbutton and remove her bra.  (*Id.*)  Defendants then put a suicide gown on Mead.  (*Id.*)  They placed her in an observation cell and left her in the gown, which would not completely fasten, until she was released approximately ten hours later.  (*Id.* at 67, 87.)

## ANALYSIS

Defendants and Defendant County have moved for summary judgment under FED. R. CIV. P. 56(c).  Summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) (citing FED. R. CIV. P. 56(c)).  A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding a motion for summary judgment, the Court views the evidence and draws all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  But that does not mean that any amount of evidence, no matter how small, will save a nonmoving party from losing

---

[3] Defendants state that they afforded Plaintiff an opportunity to change in private.  There is thus a credibility issue for a jury.  A jury might ultimately believe Defendants, and if it does then that might well make all the difference in this case.  But on summary judgment the Court takes Plaintiff's version of the facts, and Plaintiff insists under oath that she was never offered a chance to change in private.  She also says she would have accepted such an offer were one made.

on a motion for summary judgment. *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). When the nonmoving party's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

## I. FEDERAL-LAW CLAIMS

Plaintiff seeks damages under 42 U.S.C. § 1983 (LEXIS through P.L. 110-180) to compensate her for alleged violations of her constitutional rights as a pretrial detainee. In particular, Count I of Plaintiff's complaint alleges that Defendants violated her Fourth and Fourteenth Amendment rights to privacy and to be free from cruel and unusual punishment. Count II alleges that the same deprivations were the result of a county-wide policy.

### A. Count I: 1983 Claim Against Individual Defendants

#### 1. Right to Privacy

Plaintiff alleges that Defendants violated her Fourth Amendment right to privacy. Defendants respond that they did not violate Plaintiff's right to privacy because their actions were justified by their belief that Plaintiff was suicidal. The issue is whether Defendants violated Plaintiff's Fourth Amendment right to privacy when they, believing her to be suicidal, stripped her of her clothes and bra and placed her in a suicide gown without affording her the opportunity to change in private.

The Fourth Amendment guarantees a pretrial detainee, like Plaintiff in this case, a limited privacy interest.[4] *Bell v. Wolfish*, 441 U.S. 520, 558 (1979); *Cornwell v. Dahlberg*, 963 F.2d 912,

---

[4] The right to privacy under the Fourth Amendment is separate from and independent of the right to be free from excessive force. Plaintiff could not rely on the Fourth Amendment to state a claim of excessive force because Plaintiff was a pretrial detainee and the Fourth Amendment protects only "free persons" from excessive force. But Plaintiff can

4

916 (6th Cir. 1992). If a defendant takes an action against a detainee that implicates the detainee's Fourth Amendment privacy interest, then the defendant's action will be upheld as constitutional only if it is reasonable. *Id.* In determining whether a defendant's actions are reasonable, a court "must consider [a.] the scope of the particular intrusion, [b.] the manner in which it is conducted, [c.] the justification for initiating it, and [d.] the place in which it is conducted." *Id.* at 559 (citing *United States v. Ramsey*, 431 U.S. 606 (1977); *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976); *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975); *Terry v. Ohio*, 392 U.S. 1 (1968); *Katz v. United States*, 389 U.S. 347 (1967); *Schmerber v. California*, 384 U.S. 757 (1966)).

### a.  Scope of the Intrusion

The scope of the intrusion at issue here strongly weighs on the side of denying summary judgment. Even the cases cited by Defendant, though factually distinguishable from this case, are in harmony with the theme that being stripped naked is a particularly severe intrusion on the right to privacy.[5] *See, e.g.*, *Johnson v. City of Kalamazoo*, 124 F. Supp. 2d 1099, 1104 (W.D. Mich. 2000) (identifying cross-gender strip searches as "relatively serious intrusions" on the right to privacy compared to a case where male plaintiffs are "allowed to keep their underwear and t-shirts and

---

rely on the Fourth Amendment to state a claim of a violation of her right to privacy. This is because the Fourth Amendment protects even convicted prisoners' reasonable expectations of privacy. *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992) (citing *Bell v. Wolfish*, 441 U.S. 520, 558 (1979); *Kent v. Johnson*, 821 F.2d 1220, 1226–27 (6th Cir. 1987)).

[5] The Court notes that Plaintiff was not stripped completely naked. She was left with her underpants and was given a suicide gown. But for a time her bare breasts were exposed, and the Court sees this as a substantial intrusion on the right to privacy that is not, at least under the prevailing standards of modesty in this country, meaningfully different from being stripped of all covering. A woman living in the United States is certainly entitled to as much privacy in her breasts as she is in her genitals. *See, e.g.*, *Johnson v. City of Kalamazoo*, 124 F. Supp. 2d 1099, 1104 (W.D. Mich. 2000) (holding that an intrusion was reasonable because the prisoners were left with "clothing no more revealing than a swimsuit").

5

maintain a minimal measure of modesty"). There is no measure of modesty afforded to a female detainee forced to expose her bare breasts to four opposite-sex officers.

### b. Manner in Which the Intrusion Was Conducted

The manner in which the intrusion was conducted also weighs on the side of denying summary judgment. The intrusion was conducted by force and without affording Plaintiff any opportunity to avoid exposing herself to Defendants. Defendants, aware of Plaintiff's history of sexual abuse, commanded Plaintiff to take off her clothes in front of them. They then threatened her, stating that if she did not remove her clothes they would forcibly remove them. They did not afford her the option of changing in private. Instead, they joined together, stripped off all of her clothes except for her underpants, put her in a suicide gown that would not stay fastened, and locked her in an observation cell where she remained in a semi-nude state for any passerby to see.

### c. Justification for Initiating the Intrusion

Defendants contend that they removed Plaintiff's clothing as a suicide-prevention measure. They ague that their response was appropriate because they knew of Plaintiff's past suicide attempt, Plaintiff appeared depressed, and had they not taken suicide-prevention measures, they suggest, they would be defending themselves from a deliberate indifference claim.

There is sufficient evidence in the record to support Defendants' stated belief that Plaintiff was suicidal—or at least that there were legitimate questions about her state of mind—but there is also sufficient evidence in the record to allow a reasonable fact finder to conclude that Defendants' conduct was nevertheless unreasonable under the Fourth Amendment. Preventing suicide is certainly a worthy justification for a relatively minor intrusion into a detainee's privacy. *Johnson*, 124 F. Supp. 2d at 1103–04. But opposite-sex officers who strip a person—even an allegedly suicidal

6

detainee—of her clothes and bra without affording her the opportunity to change in private violate the person's Fourth Amendment right to privacy. *See Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 756–57 (6th Cir. 2004) ("Our court has recognized that 'a convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex . . . .' *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992); *see also Kent v. Johnson*, 821 F.2d 1220, 1227 (6th Cir. 1987) (assuming that 'there is some vestige of the right to privacy retained by state prisoners and that this right protects them from being forced unnecessarily to expose their bodies to guards of the opposite sex'). As one of our sister circuits has explained, most people 'have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating. When not reasonably necessary, that sort of degradation is not to be visited upon those confined in our prisons.' *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981); *see also York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963) ('We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.')"); *Rose v. Saginaw County*, 353 F. Supp. 2d 900, 920–21 (E.D. Mich. 2005) (holding that, despite the justification that the detainees were suicidal, removing their clothes was "an exaggerated response").

Defendants' belief that Plaintiff was suicidal does not justify their actions. Defendants were four male guards dealing with a female detainee they knew to have a history of sexual abuse. When she was crouched down on the floor in the fetal position they commanded her to take off her clothes in front of them. Moreover, on Plaintiff's version of the facts *they did not afford her the opportunity*

7

*to change in private.*  A reasonable fact finder could conclude this exceeded a justified response to a suicidal detainee.[6]

### d.  Place Where the Intrusion Occurred

The place where the intrusion occurred also supports Plaintiff's claim.  Plaintiff was not allowed to change in private.  She was stripped in front of four opposite-sex officers.  She was then placed in an observation cell.  She was given a suicide gown, but the gown would not fasten completely.  People walking by the cell could look in and observe Plaintiff in a semi-nude state.  Admittedly, it could have been much worse for Plaintiff: there could have been more traffic outside of the observation cell or she could have been stripped in public.  But the relative weakness of this factor is not sufficient to justify granting summary judgment for Defendants.  This factor does not weigh in favor of Defendants such that it could be said to outweigh the other factors, all of which weigh strongly in favor of Plaintiff.

### e.  Conclusion

The facts in the light most favorable to Plaintiff allow her to survive summary judgment on her Fourth Amendment claim against Defendants.  It is apparent from the caselaw discussed above that society recognizes as legitimate the subjective privacy expectation of a detainee—even a suicidal one—that she not be forcibly stripped of her clothes and bra by opposite-sex officers without first being given the opportunity to change in private.  *C.f. Hudson v. Palmer*, 468 U.S. 517, 526 (1984) (holding that prisoners were not entitled to Fourth Amendment privacy protection in their cells

---

[6] On Plaintiff's version of the facts, this is not a case where she was offered and refused less invasive alternatives.  Defendants contend that they offered to let Plaintiff change in private, but she says she was never offered the chance to change in private, and she says if she had been offered that chance she would have taken it.  Ultimately a jury might not believe her, but at the summary judgment stage, this fact makes all the difference.  It was not necessary to forcibly remove Plaintiff's clothes.  She says she would have removed them herself in private had she been given the opportunity.

because "society [was] not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell"). A reasonable jury could find that Defendants violated that right in this case.

## 2. Cruel and Unusual Punishment

Plaintiff also alleges that Defendants' conduct violated her right to be free from cruel and unusual punishment. Plaintiff does not specifically allege an Eighth Amendment violation, but her complaint invokes the protection afforded pretrial detainees by the Fourteenth Amendment's incorporation of the Eighth Amendment's prohibition on cruel and unusual punishment.

Under the Eighth Amendment, it is "'the unnecessary and wanton infliction of pain' [that] constitutes cruel and unusual punishment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)). To determine that a person has suffered cruel and unusual punishment, the Court must determine both that (1) the officials acted with a sufficiently culpable state of mind, and (2) the alleged wrongdoing was objectively harmful enough to rise to the level of a constitutional violation. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). With respect to the subjective element, "it is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Wilson v. Seiter*, 501 U.S. 294, 299 (1991). With respect to the objective element, the extent of the injury suffered by the detainee, the need for application of force, the relationship between the need and the amount of force used, the threat reasonably perceived by the officials, and efforts to temper the severity of a forceful response are all factors relevant to the determination of whether the alleged wrongdoing was objectively harmful. *Hudson*, 503 U.S. at 8–10. There is sufficient evidence in the record to allow a reasonable fact finder to conclude that both elements are established in this case.

9

**a.  Subjective Element**

Plaintiff presents evidence that would allow a reasonable fact finder to conclude that Defendants were acting with a sufficiently culpable state of mind.  One of the Defendants ambiguously characterized Plaintiff as not being a suicide risk; a written report of the incident characterized it as a disciplinary disobedience violation, not a suicide-prevention measure; and the jury could also infer a punitive motive from the argument between Plaintiff and Defendants over Plaintiff's refusal to take off her necklace.[7]  (Pl.'s Dep. 50, 71–72; Ex. 5 to Def.'s Br. (docket # 19).) Looking at all of the evidence in the light most favorable to Plaintiff, a reasonable fact finder could conclude that Defendants' proffered explanation of suicide prevention was simply pretext for a punitive intent.

**b.  Objective Element**

Plaintiff also presents sufficient evidence to allow a reasonable fact finder to conclude that Defendants' actions were objectively harmful enough to rise to the level of a constitutional violation. The objective unreasonableness of Defendants' actions is analyzed above.  *See supra* Part I.A.1.  To briefly restate, forcibly removing a detainee's clothes and bra without affording her an opportunity to change in private is unconstitutional and objectively unreasonable, particularly when the forcible removal involved four men removing a female detainee's clothing.

**B.  Count II:  1983 Claim Against Defendant County**

Plaintiff also brings a § 1983 claim against Defendant County alleging that Defendant County deprived her of her Fourth and Fourteenth Amendment rights.  In particular, Plaintiff's complaint

---

[7] The jail's written suicide policy says nothing about the necessity of completely undressing a detainee who is believed to be suicidal.  Moreover, it does not require a suicidal detainee to be placed in a suicide gown.  *See* Suicide Policy: Ex. 9 to Def.'s Br. (docket # 19).

alleges that Defendant County's failure to train its officers constituted a policy that violated her Fourth and Fourteenth Amendment rights.  In essence, Plaintiff alleges that Defendant County had a policy of not having a policy.[8]  Defendants contend that there are no facts in the record that indicate that the County had such a policy.  The issue, then, is whether the record contains sufficient facts to support Plaintiff's allegation that Defendant County had a policy of failing to train its officers and that the failure to train violated Plaintiff's constitutional rights.

A county is liable for a failure to train "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure . . . ."  *Id.* at 389.  This should not be read to suggest that counties actually have written policies detailing their intent not to train their employees, but when the need for training is obvious and the failure to train is likely to result in a violation of constitutional rights, a county can be held to have been deliberately indifferent to the need to provide proper training.  *Id.*  In such a case, the failure to train is deemed a policy, and the county can be liable for that policy if it actually causes injury.  *Id.*  Importantly, for a plaintiff to show that a county had a policy of failing to train its officers, it is not enough to show that a particular officer was unsatisfactorily trained, nor is it sufficient to prove that better training was warranted in a given case.  *Id.* at 391.  "And plainly,

---

[8] It is clear from the hearing that Plaintiff is attempting to frame this case as another in a string of cases involving county policies regarding strip searches.  But this is not a policy case.  Instead this is a case involving a single incident that had nothing whatsoever to do with a county policy.  Thus Plaintiff's claims against Defendants are analyzed under the four-factor balancing test addressed in Part I.A.  And because there is no evidence of an actual policy, Plaintiff's claims against Defendant County are analyzed under the "failure to train" test addressed in this Part of the Opinion.

adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *Id.*

Plaintiff alleges in her complaint that Defendant County had a "policy" of failing to train its officers on the proper procedures regarding strip searches, but Plaintiff never even mentions this allegation in her response brief.  At the hearing on this motion, Plaintiff's counsel quickly listed six arguments in a late attempt to save her policy claim.  None of the six arguments substantiates the allegations in the complaint, and Plaintiff's counsel neither cited caselaw nor pointed to facts set forth in an affidavit or other evidence as provided by FED. R. CIV. P. 56.  At best, then, Plaintiff is relying on the allegations in her complaint to get her through summary judgment  This is not sufficient.[9]  *See* FED. R. CIV. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.").

Plaintiff points to nothing in the record to show that there was, in fact, a failure to train.  She points to no evidence that shows that the need for training was obvious.  She points to no evidence

---

[9] Plaintiff argues in her brief and at the hearing that a district court should limit its consideration of an asserted qualified-immunity defense to the sufficiency of the allegations in the complaint.  That argument is unavailing.  To the extent that qualified immunity is raised before discovery then Plaintiff is correct that it should be considered without allowing any discovery.  This, after all, is the policy behind qualified immunity: qualified immunity makes an officer immune from suit and thereby can save an officer the inconvenience of conducting discovery.  But if qualified immunity is raised after discovery and on a motion for summary judgment—as it is here—then the Court is not bound to consider only the complaint.  Instead, "the district court *must* consider all the undisputed evidence produced as a result of discovery, read in the light most favorable to the non-moving party." *Poe v. Haydon*, 853, F.2d 418, 425 (6th Cir. 1988) (emphasis added) (citing *Green v. Carlson*, 826 F.2d 647, 650–52(7th Cir. 1987)).  "Thus, for example, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to the truth of the allegations that the defendant in fact committed acts that violate clearly established law." *Id.* (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

that shows that the failure to train caused the harm at issue here. And she points to no evidence that shows that there was more than the arguably unsatisfactory training of the officers involved here. On this record a reasonable juror could not conclude that Defendant County had a policy of failing to train officers on the proper procedures regarding strip searches. This case involves a single incident, not a policy.

### III.  STATE-LAW CLAIMS

In addition to the federal-law claims discussed above, Plaintiff seeks damages under three state-law theories. Specifically, Plaintiff alleges assault and battery, civil conspiracy, and gross negligence.

#### A.  Count III:  Assault and Battery

To establish a claim of assault, a plaintiff must show an "intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. Ct. App. 1991) (citing *Tinkler v. Richter*, 295 N.W. 201, 203 (Mich. 1940)). A reasonable fact finder could conclude that Defendants' conduct constituted an assault. As explained above, there is evidence suggesting that Defendants acted with the subjective intent to punish Plaintiff. Moreover, she was a female detainee outnumbered four to one by male officers. Defendants threatened her by force. They first demanded that she remove her clothes, then they threatened her, telling her that if she did not remove her clothes they would do it for her. And then they followed through with their threat and accomplished the contact. On this record it would be permissible for a jury to find that Defendants offered to direct unlawful force toward Plaintiff under circumstances

13

that would create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact.

To establish a claim of battery, a plaintiff must show a "wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Id.* (citing *Tinkler*, 295 N.W. at 203). The same facts that a jury could use to find assault could also be used to establish a claim of battery. There is evidence supporting the conclusion that Defendants' actions were intentional, and those intentional actions resulted in harmful or offensive touching. The record contains sufficient evidence to support a reasonable juror's conclusion that Defendants intentionally acted to physically restrain Plaintiff while they forcibly removed her clothes.

### B. Count IV: Civil Conspiracy

Plaintiff alleges in Count IV of her complaint that Defendants acted in concert to accomplish a purpose made unlawful by the Michigan Strip Search Law, MICH. COMP. LAWS § 764.25a (LEXIS through P.A. 2). Defendants' Motion argues that Defendants' conduct did not violate the Strip Search Law.

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins. Co. v Columbia Cas. Ins. Co.*, 486 N.W.2d 351, 358 (Mich. Ct. App. 1992) (citing *Feaheny v. Caldwell*, 437 N.W.2d 358 (Mich. Ct. App. 1989); *Temborius v. Slatkin*, 403 N.W.2d 821 (Mich. Ct. App. 1986)). A plaintiff alleging civil conspiracy must allege more than a mere conspiracy; the plaintiff must allege a wrong resulting in damages. *Magid v. Oak Park Racquet Club Assoc.*, 269 N.W.2d 661, 664 (Mich. Ct. App. 1978). If Plaintiff cannot show that a wrongful act entitles her to damages then she cannot demonstrate civil conspiracy because a civil

conspiracy is not itself a cause of action. *Roche v. Blair*, 9 N.W.2d 861, 863–64 (Mich. 1943); *see Early Detection Center, PC v. N.Y. Life Ins. Co.*, 403 N.W.2d 830, 836 (Mich. Ct. App. 1986) ("[A] claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable, tort."). Thus the threshold issue is whether the Michigan Strip Search Law creates a private cause of action—an "actionable tort"—such that it can be the underlying cause of action in a civil conspiracy claim.[10]

The Michigan Strip Search Law does make certain conduct unlawful, but it does not provide a private cause of action. It is simply a criminal law that makes it a misdemeanor to conduct or authorize a strip search in violation of its terms. MICH. COMP. LAWS § 764.25a(6). Under Michigan law a "private cause of action must be dismissed under a statute . . . unless the private cause of action was expressly created by the act or inferred from the fact that the act provides no adequate means of enforcement provisions." *Forster v. Delton Sch. Dist.*, 440 N.W.2d 421, 423 (Mich. Ct. App. 1989); *see Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 190 (1994) ("[W]e refuse[] to infer a private right of action from 'a bare criminal statute' . . . [a]nd we have not suggested that a private right of action exists for all injuries caused by violations of criminal prohibitions."). The Michigan Strip Search Law does not expressly provide for a private cause of action, and it provides for adequate enforcement by creating criminal penalties. *See Bailey v. Bailey*, No. 07-11672, 2008 WL 324156, at *9 (E.D. Mich. Feb. 6, 2008) (holding that a statute provides an adequate means of enforcement by creating criminal penalties). Thus a person may not bring a

---

[10] Defendants argue in their briefs that their conduct was not a "search" under the Michigan Strip Search Law. The Court need not reach that issue, however, because Plaintiff cannot get over the threshold of establishing that the Michigan Strip Search Law provides her with a cause of action. The Michigan Strip Search Law does not provide a cause of action, and as a result it is inconsequential whether Defendants' conduct fits within the definition of search.

private cause of action under the Michigan Strip Search Law, and as a result there is no underlying cause of action in Plaintiff's civil conspiracy count. Without an underlying cause of action, there can be no claim of civil conspiracy. *Roche v. Blair*, 9 N.W.2d at 864. Accordingly, Defendants are entitled to summary judgment on this Count.

### C. Count V: Gross Negligence

Plaintiff here alleges that Defendants were grossly negligent in forcibly removing her clothing. Defendants respond that Plaintiff's gross negligence claim should be dismissed because it is simply a battery claim pleaded as a gross negligence claim. The issue is whether Plaintiff alleges a separate, actionable claim of gross negligence or whether Michigan law requires the Court to dismiss Plaintiff's gross negligence claim as duplicative of her assault-and-battery claim.

Under Michigan law, to establish a claim of negligence a plaintiff must show that "(1) the defendant owed a duty to the plaintiff, (2) the defendant breached the duty, (3) the defendant's breach of the duty proximately caused the plaintiff's injuries, and (4) the plaintiff suffered damages." *Smith v. Stolberg*, 586 N.W.2d 103, 104 (Mich. Ct. App. 1998) (citing *Richardson v. Mich. Humane Society*, 561 N.W.2d 873, 874 (Mich. Ct. App. 1997)). But where a plaintiff "couches [her negligence] claim in terms of a breach of defendant's duty" not to commit an intentional tort, "plaintiff is essentially alleging an intentional, offensive touching," in which case the proper cause of action is for battery, not gross negligence. *Id.* at 104–05.

The conduct Plaintiff complains of is intentional, offensive touching. In both her gross negligence claim and her battery claim, the nub of her allegation is that she was harmed when Defendants forcibly removed her clothing. Her "claim of gross negligence is fully premised on her claim of" battery. *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004). She

16

couches her claim in terms of a breach of duty, but she is really only restating her assault-and-battery claim.[11]   Under Michigan law, the proper cause of action for the complained-of, offensive, intentional contact is battery, not negligence.  Accordingly, Defendants' Motion is granted as to Count V.

## IV.  QUALIFIED AND GOVERNMENTAL IMMUNITY

Defendants Motion argues that they are entitled to summary judgment not only because no reasonable jury could return a verdict for Plaintiff on the above claims but also because Defendants are entitled to qualified immunity from suit on Plaintiff's federal-law claims and governmental immunity from liability on Plaintiff's state-law claims.

### A.  Federal Qualified Immunity

Defendants argue that they are entitled to summary judgment even if Plaintiff can establish a violation of one or more of her constitutional rights.  They argue that they are immune from suit under the doctrine of qualified immunity.  Plaintiff contends that Defendants do not enjoy qualified immunity in this case because the constitutional rights at issue were clearly established at the time of Defendants' alleged conduct.

Even if a government official violates an individual's constitutional rights, the official is immune from suit—not just liability—if the violated right was not clearly established at the time of the official's actions.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In other words, "qualified

---

[11] Plaintiff's complaint states that Defendants "were negligent in forcibly removing the clothing of the plaintiff, a misdemeanor detainee, in violation of state law, which creates an inference of negligence."  (Compl. Count V ¶ A.)  Specifically it alleges that Defendants' forcible removal of Plaintiff's clothing was negligent because (1) it was done in willful disregard of state law regarding strip searches; (2) Defendants knew or should have known that a strip search was unjustified in this situation; and (3) Defendants' actions were reckless to the point of demonstrating a substantial lack of concern for injury to Plaintiff.  (*Id.* ¶ B.)  Rather than alleging a breach of a duty independent of the duty not to commit an intentional tort, these allegations merely attempt to turn Defendants' intentional acts into negligence.

17

immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

A two-stage inquiry is used to determine whether an officer is entitled to qualified immunity. The "threshold question" in the qualified immunity analysis is whether the facts alleged show that the officer's conduct violated a constitutional right. This means that a court must first perform the constitutional analysis—in this case the analysis presented in Part I of this Opinion—to determine whether there was a violation of a constitutional right. *Marvin v. City of Taylor*, No. 06-2008, 2007 U.S. App. Lexis 27950, at *23–*25 (6th Cir. Dec. 4, 2007). Only if a court determines that there was a violation of a constitutional right will it turn to the second question, "whether the right was clearly established . . . in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

To determine whether a right was "clearly established," courts in the Sixth Circuit should look first to decisions of the Supreme Court, then to decisions of the Sixth Circuit, then to decisions of district courts within the Sixth Circuit, then to decisions of courts from other circuits. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). But a lack of caselaw squarely governing a given case does not mean that a right is not clearly established. *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005). The question in deciding whether a right was clearly established where there is no precedent on point is whether "defendants had 'fair warning' that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005). Fair warning can be established when a violation is "sufficiently obvious under the general standards of constitutional care." *Lyons*, 417 F.3d at 579.

As explained above, Plaintiff's allegations in Count I are sufficient to establish a violation of a constitutional right. Because Plaintiff has made allegations in Count I that establish the violation of a constitutional right, the Court must turn to the second stage of the qualified immunity analysis and determine whether that right was clearly established in light of the specific context of this case.

Neither party has cited any precedent that is on all fours with this case, and the Court has not found any. Without any directly on-point precedent, this Court must decide whether an allegedly suicidal detainee's right not to be stripped of her clothes and bra by four opposite-sex officers without first being offered the chance to change in private was "sufficiently obvious under the general standards of constitutional care" to have given Defendants fair notice that their conduct would violate Plaintiff's Fourth Amendment right to privacy and Eighth Amendment (incorporated by the Fourteenth Amendment) right to be free from cruel and unusual punishment.

A case from this district addresses the issue of whether a policy of stripping inmates as part of a suicide-prevention measure violates the inmates' constitutional rights.[12] *Wilson v. City of Kalamazoo*, 127 F. Supp. 2d 855, 862 (W.D. Mich. 2000). *Wilson* held that a believed-to-be-suicidal inmate had a right to privacy that would be violated if the inmate were "stripped of all clothing and covering, even for a short period of time." *Id. Wilson*, decided in 2000, thus gave notice to officers that in certain circumstances stripping suicidal detainees can violate their constitutional rights.

Similarly, the Michigan Strip Search Law would, at a minimum, provide notice to officers that stripping a person of her clothes implicates legally protected interests. Even if one accepts

---

[12] Again, this is not a policy case, but the analysis in *Wilson* is nonetheless useful in determining whether Defendants had notice that their conduct violated a clearly established constitutional right.

19

Defendants' argument that the Strip Search Law does not apply to their conduct because they were not "searching" Plaintiff but only stripping her as part of suicide prevention, the Strip Search Law still provided notice that removing a person's clothes is a sensitive procedure that implicates a protected right—one that can be intruded on only for specific purposes and only by following specific procedures. The Strip Search Law makes it clear that an officer may strip a person to search her only under certain specified circumstances. From that it flows logically that an officer without the justification of conducting a "search" might be even more limited in the conditions under which he may strip a person to protect her from herself. By regulating strip searches, the Strip Search Law did not implicitly authorize stripping a person for reasons other than a "search." If a "strip search" implicates a privacy interest, then a 'mere' "strip" does too, and reasonable officers in Defendants' shoes would have recognized that.

Opinions from other circuits also gave notice to officers that stripping detainees, even suicidal ones, can violate their constitutional rights. The Ninth Circuit explained in October, 1963, that it could not "conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex is impelled by elementary self-respect and personal dignity." *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963). The Ninth Circuit's reasoning has been cited with approval by many courts, including courts in this circuit. *E.g.*, *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 757 (6th Cir. 2004). Certainly the Ninth Circuit's explanation is no less valid today than it was in 1963, and even in the absence of a case deciding facts identical to those in front of this Court the Ninth Circuit's reasoning establishes that it would have been obvious to an officer in the position of Defendants during this incident that stripping a person naked might offend a basic privacy right.

A 1981 decision from the Fourth Circuit further bolsters the conclusion that except in the most exigent circumstances it is obviously unconstitutional for a male officer to forcibly strip a female detainee naked without first offering the detainee the opportunity to change in private:

> Because of the conflict in the testimony, the jury was entitled to accept the plaintiff's version that she expressed a willingness to remove her underclothing if the male guards would withdraw.  Viewing the case in this light, as we must, it was wholly unnecessary for the male guards to remain in the room and to restrain the plaintiff while her underclothing was forcefully removed.  If the plaintiff was uncooperative and abusive as defendants testified and if it was impractical to assemble enough female guards to restrain the big, strong plaintiff within a reasonable time, as they also testified, there would be a different case, but the jury seems clearly to have accepted the plaintiff's version of the occurrence.

*Lee v. Downs*, 641 F.2d 1117, 1119–20 (4th Cir. 1981).  The reasoning applied by the Fourth Circuit in *Lee* is applicable in this case.  On summary judgment this Court accepts Plaintiff's version of the facts, and Plaintiff states that Defendants did not let her change into the suicide gown in private.  She states that she would have accepted such an offer if it were made.  In that light it was wholly unnecessary for Defendants to forcibly remove Plaintiff's clothing and bra.

At the time of this incident Plaintiff's right not to be stripped of her clothing and bra by four opposite-sex officers without first being given the opportunity to change in private was clearly established.  It was or should have been sufficiently obvious to Defendants—and any reasonable officer in their position—that four opposite-sex officers forcibly stripping a detainee of her clothes and bra without giving her an opportunity to change in private would violate her constitutional right to privacy.  Because Plaintiff's right to privacy in these circumstances was clearly established, the second stage of the qualified immunity analysis requires holding that Defendants are not entitled to qualified immunity on Count I.

### B.  State Governmental Immunity

Count III of Plaintiff's complaint alleges assault and battery.  Defendants argue that the Court should grant their motion for summary judgment on that Count because the claim is a tort claim and Defendants are immune from state-tort liability.

Michigan law provides immunity from tort liability to an officer or employee of a governmental agency who causes an injury to a person in the course of employment or service if (a) the officer or employee is acting within the scope of her authority or reasonably believes she is acting within the scope of her authority, (b) the agency is engaged in the exercise or discharge of a governmental function, and (c) the officer's or employee's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.  MICH. COMP. LAWS § 691.1407(2) (LEXIS through 2008 P.A. 2).  There is no governmental immunity from liability for intentional torts.  *Sudul v. City of Hamtramck*, 562 N.W.2d 478, 479 (Mich. Ct. App. 1997).

Defendants are not immune from liability in Count III.  Count III alleges assault and battery, both of which are intentional torts.  Therefore, Defendants are not entitled to governmental immunity on Count III.  *See Sudul*, 562 N.W.2d at 479 ("We especially also hold that an individual employee's intentional torts are not shielded by our governmental immunity statute.").

### CONCLUSION

Defendants' Motion is granted with respect to Counts II, IV, and V of Plaintiff's complaint. The record is totally devoid of evidence that would support Plaintiff's claim in Count II that Defendant County had a policy that violated Plaintiff's constitutional rights.  Plaintiff will be unable as a matter of law to establish her civil conspiracy claim in Count IV because the Michigan Strip Search Law does not provide the necessary underlying cause of action.  And Plaintiff's gross

negligence claim in Count V is not cognizable under Michigan law because it is fully premised on her battery claim in Count III.

Defendants' Motion is denied with respect to Counts I and III.  The record contains sufficient evidence to allow a reasonable fact finder to conclude that Plaintiff's constitutional rights, the right to privacy and the right to be free from cruel and unusual punishment, were violated as alleged in Count I.  And much of that same evidence would allow a reasonable fact finder to conclude that Plaintiff suffered an assault and battery at the hands of Defendants as alleged in Count III.


Dated:   February 13, 2008                    /s/ Robert J. Jonker
                                              ROBERT J. JONKER
                                              UNITED STATES DISTRICT JUDGE